UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re:

TLC HEALTH NETWORK,

Debtor.

Case No. 1-13-13294-CLB

Chapter 11

**MOTION FOR INTERIM AND FINAL ORDERS
AUTHORIZING DEBTOR TO INCUR POST-PETITION
SECURED DEBT AND TO USE CASH COLLATERAL**

TLC Health Network (the "Debtor"), debtor and debtor in possession, by and through its undersigned counsel, hereby moves this Court for entry of an interim order, the proposed form of which is attached hereto as Exhibit "A" (the "Interim Order"), pursuant to Sections 361, 363, and 364 of Title 11 of the United States Code (as amended, the "Bankruptcy Code") and Fed. R. Bankr. P. ("Bankruptcy Rules") 4001 in order to maintain ongoing operations and avoid immediate and irreparable harm to the Debtor's estate pending a final hearing: (i) authorizing the Debtor to incur post-petition super-priority and secured debt; (ii) authorizing the Debtor's use of cash collateral; (iii) determining that the Debtor's prepetition secured creditors' interests in cash collateral are adequately protected; (iv) scheduling a final hearing in connection with the relief sought in this Motion; and (v) granting such other and further relief as the Court deems appropriate (the "Motion"). In support of this Motion, the Debtor submits as follows:

**JURISDICTION, VENUE AND BASIS FOR RELIEF**

1. The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by the Bankruptcy Court. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are Sections 361 and 363(a) and (c)(2) of the Bankruptcy Code and Bankruptcy Rule 4001(b).

**CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001**

3. The entities with an interest in the Debtor's cash collateral are Community Bank, N.A., UPMC, the Dormitory Authority of the State of New York, and Brooks Memorial Hospital (the "Secured Creditors"). This Motion seeks authorization for the Debtor to incur post-petition super-priority and secured debt and to use cash collateral to maintain the Debtor's ordinary course business operations – primarily meeting payroll obligations to its employees and other expenses necessary to maintain the delivery of health care services. The proposed terms of usage are set forth in the Interim Order and the Budget (as that term is defined below). The proposed Interim Order (i) with respect to post-petition borrowing provides for a super-priority administrative expense claim, a senior lien on unencumbered assets, if any, a junior lien on already encumbered assets, interest at prime plus 2%, automatic perfection of liens for post-petition advances, and a maturity date of February 1, 2014, and (ii) with respect to existing pre-petition borrowing, a rollover lien to the Debtor's Secured Creditors to the same extent and validity of their respective pre-petition interest in the Debtor's assets, and proposes to continue regular scheduled payments, if any, to the secured creditors. There are no other material terms requiring disclosure under Bankruptcy Rule 4001(b)(1)(B)(iv) or 4001(c)(1)(B) in respect of the usage proposed under this Motion.

**BACKGROUND**

4. On December 16, 2013 (the "Petition Date"), the Debtor commenced this Chapter 11 case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"). The Debtor is continuing in possession

{33000/28189/AAV/00761055.DOCX} - 2 -
Case 1-13-13294-CLB    Doc 14    Filed 12/17/13    Entered 12/17/13 10:13:16    Desc Main
Document      Page 2 of 14

of its properties and is operating and managing its businesses, as debtor in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5. Additional information about the Debtor's businesses, the events leading up to the Petition Date and the Debtor's Chapter 11 petition can be found in the Declaration of Timothy Cooper in Support of Chapter 11 Petition and First Day Motions (the "Cooper Declaration"). The Debtor relies on the Cooper Declaration in making the Motion and incorporates it herein by reference.

6. The Debtor is a not for profit general hospital, organized and existing under the laws of the State of New York, licensed under Article 28 of the New York State Public Health Law.

7. Among other health care related facilities, the Debtor owns and operates Lake Shore Health Center in Irving, New York, and the Gowanda Urgent Care & Medical Center in Gowanda, New York. The Debtor primarily serves a low to middle income population as well as several underserved populations, including those located on the Seneca Indian Reservation and a large old order Amish population.

8. Through this bankruptcy proceeding, the Debtor intends to investigate options for continuing the services it provides at its facilities while pursuing the wind down of its operations in accordance with a closure plan submitted to the New York State Department of Health. Among the options being investigated by the Debtor is a transaction to sell substantially all of its assets to a purchaser which will continue the services currently provided by the Debtor.

9. The Debtor's most valuable property is Lake Shore Health Center ("Lake Shore") in Irving, New York. Lake Shore is an operating hospital facility and includes over 40 acres of land (the "Hospital Property"). In addition to the Hospital Property, the Debtor owns a number

of additional parcels of real estate, some vacant and some of which contain office buildings, clinics or related facilities (the Hospital Property, together with the Debtor's other owned real estate, is hereinafter referred to as the "Property").

10. The Property has an assessed value in excess of $15 million. The Debtor has, in fact, already obtained expressions of interest for some of the parcels of Property and the Debtor intends to subject the Property to higher and better bids during these bankruptcy proceedings. The Property is encumbered mortgages granted in favor of an affiliate (Brooks Memorial Hospital ("Brooks")) to secure a $1 million operating line of credit note (the "Operating Line") and a $1.626 million construction note (the "Construction Line") made available by Brooks. As of the Petition Date, the Operating Line had an outstanding balance of $345,000 and the Construction Line had not had any amounts drawn. In order to continue to deliver health care services and to maintain the Property, the Debtor must have access to and be able to use the Operating Line, the Construction Line, and the cash generated by its operations (the "Cash Collateral").

11. Through this motion, the Debtor requests that the Court allow it to use the Operating Line, the Construction Line, and the Cash Collateral because such use is critical to Debtor's operations and because the respective security interests of Brooks, Community Bank, N.A. ("Community"), the Dormitory Authority of the State of New York (the "Authority"), and UPMC will be adequately protected.

### SECURED CREDITORS WITH INTERESTS IN CASH COLLATERAL

**THE UPMC FACILITY:**

12. On or about May 23, 2013, UPMC and Lake Erie Regional Health System of New York ("LERHSNY") entered into a $4,000,000 Line of Credit Facility (the "UPMC Facility").

A copy of the Line of Credit Facility is annexed hereto as <u>Exhibit "B"</u>. On or about May 23, 2013, LERHSNY executed and delivered a $4,000,000 Committed Revolving Credit Note to UPMC (the "Note No. 1"). A copy of Note No. 1 is annexed hereto as <u>Exhibit "C"</u>. The current balance on the Note is approximately $1,250,000, plus interest and expenses. Essentially all of the funds borrowed by LERHSNY under the Note were paid to TLC for use by TLC in the ordinary course of its business. Historically, TLC has not made any regular monthly payment to LERHSNY or UPMC.

13. The Debtor is a guarantor of the UPMC Facility pursuant to a Guaranty Agreement dated May 23, 2013. A copy of the Guaranty Agreement is annexed hereto as <u>Exhibit "D"</u>.

14. The UPMC Facility is secured pursuant to general security agreements with the Debtor and Brooks. The Debtor granted UPMC a security interest in certain personal property pursuant to a General Security Agreement (the "TLC Security Agreement"). A copy of the TLC Security Agreement is annexed hereto as <u>Exhibit "E"</u>. Brooks also granted UPMC a security interest in certain personal property pursuant to a separate General Security Agreement. The TLC Security Agreement provides UPMC a security interest in certain assets of the Debtor as more fully described in the TLC Security Agreement including accounts, Health Care Insurance Receivables and Deposit Accounts.

**COMMUNITY BANK, N.A.:**

15. On or about January 7, 2010, the Debtor executed and delivered a Commercial Promissory Note in the principal amount of $468,435 to Community ("Note. No. 2"). A copy of Note No. 2 is annexed hereto as <u>Exhibit "F"</u>. The outstanding principal balance on Note No. 2 is

{33000/28189/AAV/00761055.DOCX}  - 5 -
Case 1-13-13294-CLB    Doc 14    Filed 12/17/13    Entered 12/17/13 10:13:16    Desc Main
Document      Page 5 of 14

approximately $32,000 and Note No. 2 matures by its terms on January 7, 2014. The regular monthly payment on Note 2 is approximately $11,127.90.

16. The Debtor's obligations pursuant to Note No. 2 are secured pursuant to Commercial Security Agreement dated January 7, 2010 (the "Community Security Agreement"). The Community Security Agreement grants a security interest in substantially all personal property pursuant of the Debtor. A copy of the Community Security Agreement is annexed hereto as Exhibit "G".

**DORMITORY AUTHORITY OF THE STATE OF NEW YORK:**

17. On or about February 10, 2009, the Authority loaned the Debtor $1,000,000 pursuant to a Reimbursement Agreement. A copy of the Reimbursement Agreement is annexed hereto as Exhibit "H". The Reimbursement Agreement calls for repayment of the loan over a five year term with the final payment due on December 1, 2014. The outstanding balance pursuant to the Reimbursement Agreement is approximately $269,000. The regular monthly payment under the Reimbursement Agreement is $16,687.55.

18. The Debtor's obligations pursuant to the Reimbursement Agreement are secured pursuant to a grant of a security interest in the hospitals "gross receipts" as that term is defined in the Reimbursement Agreement.

**BROOKS MEMORIAL HOSPITAL:**

19. Pursuant to the terms of a $1 million grid note, a mortgage, and a general security agreement all dated on or about November 26, 2013, Brooks made the Operating Line available to assist in funding the Debtor's operations. Copies of the note, security agreement and mortgage (hereinafter collectively referred to as the "Operating Line Agreements") are annexed hereto as Exhibits "I", "J", and "K", respectively. Brooks agreed to provide the funding under

the Operating Line when UPMC declined to make additional funding available under the UPMC Facility.

20. The Operating Line is provided by Brooks to enable the Debtor to continue operations while it explores its options for its facilities or terminates services in accordance with the closure plan submitted to the New York State Department of Health. As of the Petition Date, the Debtor had drawn $345,000 of the amount available under the Operating Line.

21. Pursuant to the terms of a $1.626 million note, security agreement and mortgage dated (hereinafter referred to as the "Construction Line Agreements") on or about November 26, 2013, Brooks agreed to fund the Construction Line to permit payment of the construction costs of the Gowanda urgent care facility until such time as the proceeds of a New York State grant were received by LERHSNY. Copies of the note, security agreement, and mortgage are annexed hereto as Exhibits "L", "M" and "N", respectively.

22. The Construction Line is provided by Brooks to enable the Debtor to conclude the construction of an urgent care clinic at Gowanda, New York. Construction of the urgent care facility is scheduled to be completed by the end of December 2013. The Construction Line will enable the Debtor to pay the costs and expenses of the construction of the facility. Upon submission of proof of payment of the construction costs to the New York State Department of Health (the "DOH"), the DOH will pay LERHSNY an amount equal to the construction costs through a New York State grant program, and LERHSNY will then repay Brooks the amounts drawn by the Debtor on the Construction Line.

23. The result of the availability of the Construction Line will enable the completion of the Gowanda urgent care facility and the satisfaction of the construction costs through a New

York State grant, ultimately leaving the urgent care facility free and clear of liens and encumbrances.

24. The Debtor reserves its rights with respect to challenging the validity and perfection of the Secured Creditors' purported liens.

**RELIEF REQUESTED**

25. By this Motion the Debtor seeks entry of the Interim Order pursuant to Sections 361, 363, and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b): (i) authorizing the Debtor to access the Operating Line and to use cash that may otherwise serve as collateral security for the amounts owed to the Secured Creditors (the "Cash Collateral"), and to access the Construction Line, pursuant to the budgets set forth in Exhibit "O" annexed hereto (collectively referred to hereafter as the "Budget"), as working capital to purchase goods and services and pay operating expenses related to the Debtor's ordinary course business operations, and in order to preserve the value of the Debtor's estate, including without limitation, using Cash Collateral per the Budget for a brief interim period to satisfy (a) any prepetition operating and other expenses that may be approved by the Court, (b) obligations incurred in the ongoing post-petition operations of the Debtor, and (c) any and all costs and expenses arising in connection with the administration of the Debtor's estate, on an interim basis and pending a final hearing; (ii) determining that the Secured Creditors' interests in Cash Collateral are adequately protected and authorizing the Debtor to make adequate protection payments as provided for in the Budget; and (iii) scheduling a final hearing on the Motion to consider entry of a Final Order granting the relief requested herein.

26. The Debtor also seeks authority to access the Construction Line to pay the costs and expenses of its contractors and materialmen as obligations become due in the ordinary

course of business. Absent timely payment, the contractors and materialmen would have the right to file mechanic's liens against the Gowanda urgent care facility and the reimbursements due under the New York State would be jeopardized.

## ARGUMENT

27. The Debtor should be granted access to the Operating Line and authority to use of Cash Collateral in accordance with the proposed Budget because:

- The Debtor's access to the Operating Line and the Cash Collateral is absolutely necessary for the Debtor to preserve the value of its business and Secured Creditors' collateral during the pendency of the Debtor's Chapter 11 case, and

- The proposed use of Operating Line and Cash Collateral is modest in scope and primarily designed to satisfy employee claims and to maintain critical operations pending a final hearing.

Accordingly, the proposed use of the Operating Line and Cash Collateral is necessary and appropriate under Sections 363 and 364 of the Bankruptcy Code and the Secured Creditors' interests in the Cash Collateral will be adequately protected. The use of the Construction Line is also critical to the timely completion of the Gowanda urgent care facility and will ensure that the New York State funding intended to fully pay for the construction will not be jeopardized.

A. **Debtor's Need to Use the Operating Line and Cash Collateral**

28. To the extent the Debtor's cash on hand represents Cash Collateral, it is subject to the use restriction set forth in Section 363(c)(2) of the Bankruptcy Code. Without authorization from the Court for the Debtor to use the Cash Collateral in accordance with Section 363(c)(2)(B) of the Bankruptcy Code, and without access to the Operating Line in accordance with Section

364(c), the Debtor will be left without a sufficient source of working capital and will be unable to operate its businesses and, thereby, preserve the value of its estate for the benefit of creditors. The ability of the Debtor to preserve its business and assets, and ultimately to make a distribution to creditors, will be adversely affected if the Debtor is unable to fund its daily business operations from the Operating Line and the use of Cash Collateral. Without the ability to fund the Debtor's current operations on an interim basis, the ability to continue to provide patient care and the value of the Debtor's assets will be irreparably harmed.

### B. Adequate Protection

29. Pursuant to Section 363(c)(2) of the Bankruptcy Code, a debtor-in-possession may not use cash collateral without the consent of the secured party or approval by the Court. By obtaining approval to use cash collateral, a debtor can continue to operate its business and maintain and enhance the value of its lenders' collateral. *See, e.g., In re Megan Racine Associates Inc.*, 202 B.R. 660, 663 (Bankr. N.D.N.Y. 2002); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991). Section 363(e) of the Bankruptcy Code provides that on request of an entity that has an interest in property used or proposed to be used by the debtor, the court shall prohibit or condition such use as is necessary to provide "adequate protection" of that interest. 11 U.S.C. §363(e); s*ee Zink v. Vanmiddlesworth*, 300 B.R. 394, 402-03 (N.D.N.Y. 2003) (burden is on creditor to show collateral value decline in order to justify provision of adequate protection or additional adequate protection).

30. What constitutes "adequate protection" must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985). The adequate protection requirement is meant to prevent the diminution in the value of the secured creditors' interests in their collateral during the reorganization process. *See*

*Megan Racine, supra* (*citing, In re Gallegos Research Group Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995) (*citing in turn, United Savings Ass'n of Texas v. Timbers of Imwood Forest Assoc., Ltd.*, 484 U.S. 365 (1988) ("[T]o determine whether an entity is entitled to adequate protection and the type and amount of adequate protection required, a court must determine the value of the collateral, the creditor's interest in the collateral and the extent to which that value will decrease during the course of the bankruptcy case"); *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990) (permitting bank to receive adequate protection only where value of lender's entire property interest, not just its interest in the cash sought to be used, is declining); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (focus is on protection of the secured creditor from diminution in value of its collateral during reorganization process). Where a debtor's cash is liened and used to enhance a secured creditor's collateral value and to increase the value of collateral, such use demonstrates the existence of adequate protection. *In re 499 W. Warren Street Associates Ltd. Partnership*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992); s*ee also In re Diaconix Corp.*, 69 B.R. 333, 336 (Bankr. E.D. Pa. 1987) (third party guaranty can serve as adequate protection).

31. In this case, where the Budget is designed to maintain the Debtor's critical operations, the proposed access to the Operating Line and the use of Cash Collateral allows the generation of additional receivables, enhances the opportunity for selling assets as operating units, and maintains the value of the Secured Creditors' other collateral. It is in the interests of the Secured Creditors (as well as all of the Debtor's creditors) to maintain the orderly operation of the business operations, while the Debtor works on a sale of the Property.

32. Further, the Debtor will suffer great harm if it is not authorized to use the Operating Line and Cash Collateral, as the Debtor will have no source of working capital for the

business, and the business will not be able to fund its daily business operations, which again, are all preservative of and of direct benefit to the value of the Secured Creditors' collateral. The Debtor will not be able to pay suppliers, employees or other ordinary course obligations if it is not allowed to use the Operating Line and Cash Collateral per the Budget and to use it with appropriate flexibility as set forth in the Interim Order. Failure to approve the use of the Operating Line and Cash Collateral as requested herein will lead to disastrous consequences not only for the Debtor, but for all parties in interest, including the Secured Creditors, other creditors, and the communities served by the Debtor.

**The Need for Immediate Relief**

33. Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), a final hearing on a motion for the use of cash collateral and to obtain credit may not be commenced earlier than fourteen (14) days after service of that motion. However, the court may conduct an interim hearing before the expiration of the 14-day period and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

34. Pursuant to Bankruptcy Rule 4001(b), the Debtor requests that the Court conduct an expedited interim hearing on or prior to **December 23, 2013**, pending any hearing to be held to consider the final relief requested by this Motion. In connection with such interim hearing, and the pendency period thereafter to any final hearing set by the Court, the Debtor requests that the Court authorize the Debtor to use such Cash Collateral and obtain credit as is essential to make its payroll, to ensure the maintenance of ongoing operations, and to avoid immediate and irreparable harm to its estate -- all as reflected in the line items of the Budget.

35. Without the Court's authorization to use the Cash Collateral and obtain credit on an interim basis pending a final hearing on this Motion, the Debtor's estate will be imminently and irreparably harmed. Employees will not be paid and, as discussed above, the Debtor will not be able to operate without the use of Cash Collateral, resulting in adverse consequences not only for the Debtor, but also for the Secured Creditors, other creditors, employees, local suppliers, the community served by the Debtor's operations, and all parties in interest. Under the circumstances, the interim use of the Cash Collateral and access to the Operating Line by the Debtor is appropriate in this case.

## NOTICE

36. Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) counsel to UPMC; (iii) Community Bank, N.A.; (iv) the Authority; (v) counsel for Brooks Memorial Hospital, (vi) the Attorney General for the State of New York; (vii) the Internal Revenue Service, and (viii) the creditors holding the 20 largest unsecured claims against the Debtor's estate, as identified in the Debtor's Chapter 11 petition. The Debtor submits that no other or further notice need be provided.

## NO PRIOR REQUEST

37. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter the Interim Order: (i) authorizing the Debtor to use cash that may otherwise serve as Cash Collateral and to obtain credit under the Operating Line pursuant to the Budget for the period specified in the Interim Order; (ii) determining that the Secured Creditors' interests in Cash Collateral are adequately

protected; (iii) scheduling hearings in connection with the relief sought in the Motion; and (iv) granting such other and further relief as the Court deems appropriate.

Dated:  December 16, 2013
        Syracuse, New York

**MENTER, RUDIN & TRIVELPIECE, P.C.**
*Proposed Counsel for Debtor and Debtor in Possession*

By:   */s/Jeffrey A. Dove*
Jeffrey A. Dove, Esq. (Bar Roll No. 101532)
Office and Post Office Address
308 Maltbie Street, Suite 200
Syracuse, New York 13204-1439
Telephone:  (315) 474-7541
Facsimile:  (315) 474-4040