UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re:

TLC HEALTH NETWORK,

Debtor.

Case No. 1-13-13294-CLB

Chapter 11

**MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING
DEBTOR TO INCUR ADDITIONAL POST-PETITION SECURED
DEBT AND TO USE CASH COLLATERAL**

TLC Health Network (the "Debtor"), debtor and debtor in possession, by and through its undersigned counsel, hereby moves this Court for entry of an interim order pursuant to Sections 361, 363, and 364(d) of Title 11 of the United States Code (as amended, the "Bankruptcy Code") and Fed. R. Bankr. P. ("Bankruptcy Rules") 4001 in order to maintain ongoing operations and avoid immediate and irreparable harm to the Debtor's estate pending a final hearing: (i) authorizing the Debtor to incur additional post-petition super-priority and secured debt; (ii) authorizing the Debtor's use of cash collateral; (iii) determining that the Debtor's existing prepetition and post-petition secured creditors' interests in collateral are adequately protected; (iv) scheduling a final hearing in connection with the relief sought in this Motion; and (v) granting such other and further relief as the Court deems appropriate (the "Motion"). In support of this Motion, the Debtor submits as follows:

### JURISDICTION, VENUE AND BASIS FOR RELIEF

1. The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by the Bankruptcy Court. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are Sections 361, 363(a) and (c)(2), and 364(d) of the Bankruptcy Code and Bankruptcy Rule 4001(b).

### CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001

3. Pursuant to this Motion the Debtor seeks authority to borrow up to $1 million from the Dormitory Authority of the State of New York ("DASNY") (the "DASNY Loan") on a senior secured basis, pursuant to the terms of a note, mortgage, security agreement, and such other documents as may be approved by the Court. The Debtor also seeks authority to continue to use cash collateral.

4. The entities with an interest in the Debtor's cash collateral as of the Petition Date (as defined below) were Community Bank, N.A., UPMC, DASNY, and Brooks Memorial Hospital ("Brooks) (collectively, the "Secured Creditors"). Pursuant to prior orders of this Court, the Debtor was authorized to borrow up to approximately $655,000 in post-petition funding from Brooks with such funding secured by a first mortgage on the Debtor's real estate (excluding the Gowanda Urgent Care Facility and the Forestville Clinic – which are mortgaged to secure a separate $1.65 million construction loan) and by a junior lien on substantially all of the Debtor's personal property. By this Motion, the Debtor seeks authorization to utilize the DASNY Loan and to continue to use cash collateral in which the Secured Creditors have an interest, in order to maintain the Debtor's ordinary course business operations – primarily meeting payroll obligations to its employees and other expenses necessary to maintain the delivery of health care services. The DASNY Loan documents will provide for a super-priority administrative expense claim, a senior priming lien on the Debtor's real and personal property (priming the collateral positions currently held by UPMC, Brooks, and DASNY), interest at 1%, automatic perfection of liens for post-petition advances, and a maturity date one (1) year from

the first disbursement unless TLC exits from bankruptcy or sells its assets earlier. There are no other material terms requiring disclosure under Bankruptcy Rules 4001(b)(1)(B)(iv) or 4001(c)(1)(B) in respect of the usage proposed under this Motion.

## BACKGROUND

5. On December 16, 2013 (the "Petition Date"), the Debtor commenced this Chapter 11 case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330. The Debtor is continuing in possession of its properties and is operating and managing its businesses, as debtor in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code, while it seeks a buyer for some or all of its business.

6. Additional information about the Debtor's businesses, the events leading up to the Petition Date and the Debtor's Chapter 11 petition can be found in the Declaration of Timothy Cooper in Support of Chapter 11 Petition and First Day Motions [Docket No. 15] (the "Cooper Declaration"). The Debtor relies on the Cooper Declaration in making the Motion and incorporates it herein by reference.

7. The Debtor is a not for profit general hospital, organized and existing under the laws of the State of New York, licensed under Article 28 of the New York State Public Health Law.

8. Among other health care related facilities, the Debtor owns and operates Lake Shore Health Center in Irving, New York, and the Gowanda Urgent Care & Medical Center in Gowanda, New York. The Debtor primarily serves a low to middle income population as well as several underserved populations, including those located on the Seneca Indian Reservation and a large old order Amish population.

9. Through this bankruptcy proceeding, the Debtor intends to investigate options for continuing the services it provides at its facilities while pursuing the wind down of its operations in accordance with a closure plan submitted to the New York State Department of Health. Among the options being investigated by the Debtor is a transaction to sell substantially all of its assets to a purchaser which will continue some or all of the services currently provided by the Debtor.

10. The Debtor's most valuable property is Lake Shore Health Center ("Lake Shore") in Irving, New York. Lake Shore is an operating hospital facility and includes over 40 acres of land (the "Hospital Property"). In addition to the Hospital Property, the Debtor owns a number of additional parcels of real estate, some vacant and some of which contain office buildings, clinics or related facilities (the Hospital Property, together with the Debtor's other owned real estate (excluding the Gowanda Urgent Care Facility and Forestville Clinic, which are collectively referred to as the "Construction Collateral"), is hereinafter referred to as the "Property").

11. The Property has an assessed value in excess of $15 million. The Debtor has, in fact, already obtained expressions of interest for some of the parcels of Property and the Debtor intends to subject the Property to higher and better bids during these bankruptcy proceedings. The Property is encumbered by mortgages granted in favor of an affiliate (Brooks Memorial Hospital ("Brooks")) to secure a $1 million operating line of credit note (the "Operating Line") entered into shortly prior to the Petition Date. As of the Petition Date, the Operating Line had an outstanding balance of $345,000 and pursuant to orders of the Court, the Debtor was authorized to draw the balance of the Operating Line.

12. In order to continue to deliver health care services and to maintain its assets while it explores sale opportunities, the Debtor must have access to and be able to use the additional funding offered by the DASNY Loan, and to be able to continue to use the cash generated by its operations (the "Cash Collateral").

13. Through this motion, the Debtor requests that the Court allow it to use the DASNY Loan and the Cash Collateral because such use is critical to Debtor's operations and because the respective security interests of UPMC, Brooks, and DASNY will be adequately protected.

<u>SECURED CREDITORS WITH INTERESTS IN CASH COLLATERAL</u>

**THE UPMC FACILITY:**

14. As set forth in prior pleadings filed with the Court, on or about May 23, 2013, UPMC and Lake Erie Regional Health System of New York ("LERHSNY") entered into a $4,000,000 Line of Credit Facility (the "UPMC Facility"). On or about May 23, 2013, LERHSNY executed and delivered a $4,000,000 Committed Revolving Credit Note to UPMC (the "Note No. 1"). The current balance on the Note is approximately $1,250,000, plus interest and expenses. Essentially all of the funds borrowed by LERHSNY under the Note were paid to TLC for use by TLC in the ordinary course of its business. Historically, TLC has not made any regular monthly payment to LERHSNY or UPMC.

15. The Debtor is a guarantor of the UPMC Facility pursuant to a Guaranty Agreement dated May 23, 2013.

16. The UPMC Facility is secured pursuant to general security agreements with the Debtor and Brooks. The Debtor granted UPMC a security interest in certain personal property pursuant to a General Security Agreement (the "TLC Security Agreement"). Brooks also

granted UPMC a security interest in certain personal property pursuant to a separate General Security Agreement. The TLC Security Agreement provides UPMC a security interest in certain assets of the Debtor as more fully described in the TLC Security Agreement including accounts, Health Care Insurance Receivables and Deposit Accounts.

**COMMUNITY BANK, N.A.:**

17. On or about January 7, 2010, the Debtor executed and delivered a Commercial Promissory Note in the principal amount of $468,435 to Community Bank, N.A. ("Note. No. 2"). The outstanding principal balance on Note No. 2 on the Petition Date was approximately $32,000 and Note No. 2 matured by its terms on January 7, 2014. The Note No. 2 has been paid in full and Community Bank, N.A. is no longer a secured creditor of the Debtor.

**DORMITORY AUTHORITY OF THE STATE OF NEW YORK:**

18. On or about February 10, 2009, DASNY loaned the Debtor $1,000,000 pursuant to a Reimbursement Agreement. The Reimbursement Agreement calls for repayment of the loan over a five year term with the final payment due on December 1, 2014. The outstanding balance pursuant to the Reimbursement Agreement as of the Petition Date was approximately $269,000. The regular monthly payment under the Reimbursement Agreement is $16,687.55.

19. The Debtor's obligations pursuant to the Reimbursement Agreement are secured pursuant to a grant of a security interest in the hospitals "gross receipts" as that term is defined in the Reimbursement Agreement.

**BROOKS MEMORIAL HOSPITAL:**

20. Pursuant to the terms of a $1 million grid note, a mortgage, and a general security agreement all dated on or about November 26, 2013, Brooks made the Operating Line available to assist in funding the Debtor's operations. Brooks agreed to provide the funding under the

Operating Line when UPMC declined to make additional funding available under the UPMC Facility.

21. The Operating Line is provided by Brooks to enable the Debtor to continue operations while it explores its options for its facilities or terminates services in accordance with the closure plan submitted to the New York State Department of Health. As of the Petition Date, the Debtor had drawn $345,000 of the amount available under the Operating Line.

22. Pursuant to the terms of a $1.626 million note, security agreement, and mortgage dated on or about November 26, 2013 (hereinafter referred to as the "Construction Line Agreements"), Brooks agreed to fund the Construction Line to permit payment of the construction costs of the Gowanda urgent care facility until such time as the proceeds of a New York State grant were received by LERHSNY.

23. By order of the Court dated December 24, 2013, the Debtor was authorized to borrow under the Operating Line and Construction Line.

## RELIEF REQUESTED

24. By this Motion the Debtor seeks entry of an interim order[1] pursuant to Sections 361, 363, and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b): (i) authorizing the Debtor to access the DASNY Loan and to use cash that may otherwise serve as collateral security for the amounts owed to the Secured Creditors (the "Cash Collateral"), as working capital to purchase goods and services and pay operating expenses related to the Debtor's ordinary course business operations, and in order to preserve the value of the Debtor's estate, including without limitation, using Cash Collateral for a brief interim period to satisfy (a)

---

[1] As a result of the very short time frame within which the DASNY Loan was made available to TLC, the documentation memorializing the loan has yet to be completed and accordingly, TLC is unable to attach proposed loan documents or a proposed order to this Motion. TLC will provide those documents to the Court, the U.S. Trustee's Office, and the Secured Creditors as soon as drafts are available.

obligations incurred in the ongoing post-petition operations of the Debtor, and (b) any and all costs and expenses arising in connection with the administration of the Debtor's estate, on an interim basis and pending a final hearing; (ii) determining that the Secured Creditors' interests in Collateral and Cash Collateral are adequately protected and authorizing the Debtor to make adequate protection payments as may be required; and (iii) scheduling a final hearing on the Motion to consider entry of a Final Order granting the relief requested herein.

### ARGUMENT

25. The Debtor should be granted access to the DASNY Loan and authority to use of Cash Collateral in accordance with the proposed Budget because:

- The Debtor's access to the DASNY Loan and the Cash Collateral is absolutely necessary for the Debtor to preserve the value of its business and Secured Creditors' collateral during the pendency of the Debtor's Chapter 11 case, and

- The proposed use of DASNY Loan is modest in scope and primarily designed to satisfy employee claims and to maintain critical operations while the Debtor explores its options for the sale of its assets.

Accordingly, the proposed use of the DASNY Loan and Cash Collateral is necessary and appropriate under Sections 363 and 364 of the Bankruptcy Code and the Secured Creditors' interests in the Collateral and Cash Collateral will be adequately protected.

**A. Debtor's Need to Use the Operating Line and Cash Collateral**

26. To the extent the Debtor's cash on hand represents Cash Collateral, it is subject to the use restriction set forth in Section 363(c)(2) of the Bankruptcy Code. Without authorization from the Court for the Debtor to use the Cash Collateral in accordance with Section 363(c)(2)(B)

of the Bankruptcy Code, and without access to the DASNY Loan in accordance with Section 364(d), the Debtor will be left without a sufficient source of working capital and will be unable to operate its businesses and, thereby, preserve the value of its estate for the benefit of creditors. The ability of the Debtor to preserve its business and assets, and ultimately to make a distribution to creditors, will be adversely affected if the Debtor is unable to fund its daily business operations from the DASNY Loan and the use of Cash Collateral. Without the ability to fund the Debtor's current operations on an interim basis, the ability to continue to provide patient care and the value of the Debtor's assets will be irreparably harmed.

**B. Adequate Protection**

27. Pursuant to Section 363(c)(2) of the Bankruptcy Code, a debtor-in-possession may not use cash collateral without the consent of the secured party or approval by the Court. By obtaining approval to use cash collateral, a debtor can continue to operate its business and maintain and enhance the value of its lenders' collateral. *See, e.g., In re Megan Racine Associates Inc.*, 202 B.R. 660, 663 (Bankr. N.D.N.Y. 2002); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991). Section 363(e) of the Bankruptcy Code provides that on request of an entity that has an interest in property used or proposed to be used by the debtor, the court shall prohibit or condition such use as is necessary to provide "adequate protection" of that interest. 11 U.S.C. §363(e); s*ee Zink v. Vanmiddlesworth*, 300 B.R. 394, 402-03 (N.D.N.Y. 2003) (burden is on creditor to show collateral value decline in order to justify provision of adequate protection or additional adequate protection).

28. What constitutes "adequate protection" must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985). The adequate protection requirement is meant to prevent the diminution in the

{33000/28189/AAV/00778477.DOCX} - 9 -
Case 1-13-13294-CLB    Doc 98    Filed 01/17/14    Entered 01/17/14 14:42:32    Desc Main
Document      Page 9 of 12

value of the secured creditors' interests in their collateral during the reorganization process. *See Megan Racine, supra* (*citing, In re Gallegos Research Group Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995) (*citing in turn, United Savings Ass'n of Texas v. Timbers of Imwood Forest Assoc., Ltd.*, 484 U.S. 365 (1988) ("[T]o determine whether an entity is entitled to adequate protection and the type and amount of adequate protection required, a court must determine the value of the collateral, the creditor's interest in the collateral and the extent to which that value will decrease during the course of the bankruptcy case"); *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990) (permitting bank to receive adequate protection only where value of lender's entire property interest, not just its interest in the cash sought to be used, is declining); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (focus is on protection of the secured creditor from diminution in value of its collateral during reorganization process). Where a debtor's cash is liened and used to enhance a secured creditor's collateral value and to increase the value of collateral, such use demonstrates the existence of adequate protection. *In re 499 W. Warren Street Associates Ltd. Partnership*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992); s*ee also In re Diaconix Corp.*, 69 B.R. 333, 336 (Bankr. E.D. Pa. 1987) (third party guaranty can serve as adequate protection).

29. In this case, where the Budget is designed to maintain the Debtor's critical operations, the proposed access to the DASNY Loan and the use of Cash Collateral allows the generation of additional receivables, enhances the opportunity for selling assets as operating units, and maintains the value of the Secured Creditors' other collateral. It is in the interests of the Secured Creditors (as well as all of the Debtor's creditors) to maintain the orderly operation of the business operations, while the Debtor works on a sale of the Property.

30. Further, the Debtor will suffer great harm if it is not authorized to use the DASNY Loan and Cash Collateral, as the Debtor will have no source of working capital for the business, and the business will not be able to fund its daily business operations, which again, are all preservative of and of direct benefit to the value of the Secured Creditors' collateral. The Debtor will not be able to pay suppliers, employees or other ordinary course obligations if it is not allowed to use the DASNY Loan and Cash Collateral with appropriate flexibility. Failure to approve the use of the DASNY Loan and Cash Collateral as requested herein will lead to disastrous consequences not only for the Debtor, but for all parties in interest, including the Secured Creditors, other creditors, and the communities served by the Debtor.

31. The Debtor believes that the value of its real estate provides adequate protection for any interest of the Secured Creditors that are subordinated in favor of the DASNY Loan pursuant to Bankruptcy Code Section 364(d).

**The Need for Immediate Relief**

32. Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), a final hearing on a motion for the use of cash collateral and to obtain credit may not be commenced earlier than fourteen (14) days after service of that motion. However, the court may conduct an interim hearing before the expiration of the 14-day period and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

33. Pursuant to Bankruptcy Rule 4001(b), the Debtor requests that the Court conduct an expedited interim hearing on **January 22, 2014 at 1:00 p.m.**, pending any hearing to be held to consider the final relief requested by this Motion.

## NOTICE

34. Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) counsel to UPMC; (iv) counsel to DASNY; (v) counsel for Brooks Memorial Hospital, and (vi) counsel for the Official Committee of Unsecured Creditors. The Debtor submits that no other or further notice need be provided.

## NO PRIOR REQUEST

35. A prior motion seeking authority to borrow funds under the Brooks Operating Line and Construction Line was filed with and approved by this Court. No prior motion for the relief requested herein with respect to the DASNY Loan has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter an interim order: (i) authorizing the Debtor to use cash that may otherwise serve as Cash Collateral and to obtain credit under the DASNY Loan for the period specified in the interim order; (ii) determining that the Secured Creditors' interests are adequately protected; (iii) scheduling hearings in connection with the relief sought in the Motion; and (iv) granting such other and further relief as the Court deems appropriate.

Dated: January 17, 2014
Syracuse, New York

**MENTER, RUDIN & TRIVELPIECE, P.C.**
*Proposed Counsel for Debtor and Debtor in Possession*

By: */s/Jeffrey A. Dove*
Jeffrey A. Dove, Esq. (Bar Roll No. 101532)
Office and Post Office Address
308 Maltbie Street, Suite 200
Syracuse, New York 13204-1439
Telephone: (315) 474-7541
Facsimile: (315) 474-4040