UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
_____

In re:

       TLC HEALTH NETWORK,

                Debtor.

_____

                               Case No. 1-13-13294-CLB

                               Chapter 11

## MOTION OF TLC HEALTH NETWORK TO (A) (I) ESTABLISH BID AND SALE PROCEDURES, UNDER §§ 105(a) 363(b), (f), AND (m), 365, AND 1146(c), AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004, AND 6006, FOR THE SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS; (II) SCHEDULING A HEARING ON THE APPROVAL OF THE SALE; AND (III) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE; AND (B) AUTHORIZING THE <u>ASSUMPTION AND ASSIGNMENT OF DESIGNATED CONTRACTS</u>

TLC Health Network, as debtor and debtor in possession (the "Debtor"), pursuant to

Bankruptcy Code Sections 363 and 365 and Bankruptcy Rules 6004 and 6006, moves this Court

for entry of an order (the "Procedures Order") authorizing an auction process, approving bid

procedures, and setting a final hearing (the "Sale Hearing") for the disposition of substantially all

of the Debtor's assets and contracts and related relief (the "Motion").  In support of its Motion,

the Debtor respectfully represents as follows:

### SUMMARY OF RELIEF REQUESTED

The Debtor is in the process of marketing substantially all of its assets for sale and seeks

to establish procedures for a bid and sale process.  The goal is a transparent process designed to

determine the highest and best bid for the assets under current market conditions.  The Debtor

believes that a sale of its assets to an interested party will maximize the value of the Debtor's

estate and will represent the best possible outcome for the case.

<u>**BACKGROUND AND JURISDICTION**</u>

1.      On December 16, 2014 (the "Petition Date"), Debtor commenced its reorganization case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2.      The Debtor continues to operate its businesses and manage its properties as a debtor in possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On January 6, 2014, an Official Committee of Unsecured Creditors was appointed in the Debtor's case (the "Creditors' Committee").

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are §§ 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

<u>**The Business**</u>

5.      The Debtor's predecessor, Lake Shore Hospital, Inc. established the Hospital as a not-for-profit community hospital in 1965, its mission focused on delivering a broad range of emergency, acute care and long term care services to residents of Northern Chautauqua, Southern Erie and Western Cattaraugus Counties. Lake Shore set quality and service as a key differentiator with the values of compassion, professionalism, and integrity at the forefront, in keeping with the mantra "Quality Healthcare Where Caring Comes First." As of the Petition Date, the Hospital hosted a wide range of services including: Acute Care, Behavioral Health, Cardiac Rehabilitation, Cardiopulmonary, Diagnostic Imaging, Emergency Care, Gastroenterology, Home Health Care, Laboratory Services, Long Term Care, Physical Therapy, Short Term Rehabilitation, Surgical Care, and Women's Imaging.

6.     The Hospital's primary and secondary service areas include a largely rural population in Northern Chautauqua, Southern Erie, and Western Cattaraugus Counties. Seventy-five percent of the hospital's patient population derives from the following zip codes:  Angola (14006), Gowanda (14070), Silver Creek (14136), Irving (14081), Forestville (14062), Derby (14047), Dunkirk (14048), North Collins (14111), South Dayton (14138), Cattaraugus (14719), Perrysburg (14129), Collins (14034), and Fredonia (14063).

7.     Besides the general population, the Hospital serves many vulnerable and underserved populations including the Seneca Nation of Indians (Cattaraugus and Allegheny Reservations), a large old-order Amish population, and a host of seasonal migrant workers.  In addition, the shores of Lake Erie provide an influx of seasonal beachfront residents that often turn to the Hospital for their healthcare needs.

8.     To further service its local population's healthcare needs, along with the Hospital, the Debtor also maintains other health care facilities throughout the Tri-County Region of Western New York, including, among others, an Urgent Care and Primary Care Facilities in Gowanda, New York, and Forestville, New York, and a Chemical Dependency Clinic in Cassadaga, New York.

9.     Due to financial pressures created by declining populations and patient volumes, declining reimbursement rates, and increased mandates, Lake Shore endeavored to complete a series of mergers with other local hospitals.  Lake Shore believed that by combining resources with other hospitals it could save money through consolidation of administrative costs, streamlining operations and increased barraging power with vendors due to a larger economic scale.

10. Accordingly, in 2002, the Lake Shore merged with Tri-County Memorial Hospital ("Tri-County") in Gowanda to form the Debtor, as it was constituted as of the Petition Date (the "Tri-County Merger"). Although the Tri-County Merger resulted in some cost-savings, both the Hospital and Tri-County continued to struggle financially.

11. Following the Berger Commission Report 2008, the board of the Debtor and the board of neighboring Brooks Memorial Hospital ("Brooks") agreed to a merger (the "LERHSNY Merger"). Under the terms of the LERHSNY Merger, the Debtor and Brooks agreed to form a parent corporation named Lake Erie Regional Health System of New York ("LERHSNY"), to hold and operate both the Debtor and Brooks. The Debtor and Brooks remained separate not-for-profit corporations.

12. The Debtor continued to struggle after the LERHSNY Merger. Despite efforts to downsize operations and effect service and system efficiencies, the Debtor's accumulated and emergent financial burdens reached critical proportions. The Debtor's financial deterioration threatened not only the Debtor's own financial viability but threatened the financial sustainability as LERHSNY enterprise, including LERHSNY's ability to operate Brooks.

13. In 2009, a major flood destroyed Tri-County Memorial Hospital, forced its closure and left the Hospital as the Debtor's only operating hospital facility. The Debtor's attempts to rebuild Tri-County also failed and lead to a further deterioration in the Debtor's financial position. The Debtor's financial struggles after its failed attempt to rebuild Tri-County continued to be exacerbated by declining populations and patient volumes, declining reimbursement rates, and increased mandates.

14. In the five years after the LERHSNY Merger, the Debtor's losses from operations total over $24 million. The Debtor lost approximately $6.5 million in 2008, $1.6 million in

2009, $1.2 million in 2011, $4 million in 2012, and approximately, $7.4 million from January 1, 2013 through September 30, 2013. The Debtor has continued to operate despite these losses by transfers of operating funds from Brooks and loans from UPMC.

15.    On October 15, 2013, the LERHSNY board of directors made the decision to cease all operations at the Hospital, with the exception of its emergency services on January 31, 2014 (the "Closure Date") in order to end the Debtor's deepening financial shortfalls and preserve the ability of the remainder of the LERHSNY system, including Brooks, to provide continuity of service to the region (the "Closure Decision").

16.    In the weeks after the Closure Decision, however, it become apparent that the Hospital would not have the cash to operate through the Closure Date and that the continued operations of the Hospital could result in the closure of the entire LERHSNY system. Accordingly, the LERSHNY board resolved that the Debtor would immediately file for relief under Chapter 11 of the Bankruptcy Code.

**Capital Structure, Equity Sponsors, and Secured Loan Facility**

17.    The Debtor is a New York not for profit corporation whose "active parent" is LERHSNY.

18.    As of the Petition Date, the Debtor's obligations for secured debt included:

| | |
|---|---|
| Community Bank, NA | $34,000 |
| Dormitory Authority of State of New York[1] | $240,000 |
| UPMC | $1,250,000 |
| Brooks | $340,000 |

19.    Since the Petition Date, the Community Bank loan has been paid in full, the UPMC debt has been reduced to approximately $700,000, and DASNY has been paid down to

---

[1] Hereinafter referred to as "DASNY".

approximately $180,000. Also since the Petition Date, the Court has authorized the Debtor to borrow additional operating capital, as follows:

Brooks[2]          $60,000
DASNY[3]           $1,000,000

20.     Accordingly, the Debtor's assets currently secure financing in the amount of approximately $1.88 million, and are anticipated to secure an additional $500,000 by the time of the Sale Hearing.

21.     The Debtor continues to lose money on operations, and does not have financing available to continue to operate while it seeks a definitive contract to sell or refinance its assets.

22.     The Debtor has been discussing a sale transaction involving some or all of its assets with a number of entities, but the Debtor has insufficient capital resources to continue to operate until a definitive contract with one or more of those entities is executed.

23.     In light of its limited financial resources, the Debtor, in consultation with its secured creditors and the Committee, has determined that it is appropriate and in the best interests of its creditors to seek authority to sell substantially all of its assets pursuant to 11 U.S.C. § 363. The Debtor believes that seeking a sale of substantially all of its assets will provide the best opportunity for satisfying the claims of the secured creditors and maximizing the return for the Debtor's unsecured creditors. A sale of substantially of all of the Debtor's assets will also provide the opportunity for the continuation of some or all of the health care services currently provided by the Debtor.

---

[2] The Debtor has borrowed the $660,000. In addition to the funding for operations, the Court also approved a $1.65 million loan from Brooks to permit the Debtor to pay certain construction costs associated with the Gowanda Urgent Care facility. The construction loan was fully funded and has since been repaid by the proceeds of a HEAL grant.
[3] Although authorized, the Debtor has yet to draw on the DASNY facility. It is anticipated that the Debtor will draw $500,000 on the DASNY facility prior to the Sale Hearing.

<u>**SALE AND AUCTION PROCEDURES**</u>

24.     Pursuant to §§ 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 6006, the Debtor seeks approval of procedures for the submission of bids and the sale of its assets and assumption and assignment of associated executory contracts.  Parties that respond and are interested will be required to execute a non-disclosure confidentiality agreement (the "Confidentiality Agreement").  Upon receipt of the Confidentiality Agreement, interested bidders will be given access to various data to assist them in formulating their bids.  In an effort to get the best possible result for this case and maximize value, it is anticipated that the sale process will be spearheaded by the Debtor and Debtor's retained broker, the Hill Group, Inc., with oversight from the Creditors' Committee and the secured creditors.

25.     The Debtor proposes a hearing to consider approval of bid procedures for the week of June 9, 2014, with a Sale Hearing to take place on or about July 16 2014.  The proposed time frame will give interested parties an opportunity to conclude their due diligence and finalize a purchase offer, while also allowing the Debtor to continue its business operations through the sale process.

26.     In order to facilitate an orderly sale process, the Debtor has prepared a "form" Asset Purchase Agreement (the "Agreement") providing for the purchase and sale of the Purchased Assets (defined below), in a form attached to this Motion as Exhibit "A".  The use of a uniform agreement will enable the Debtor, the secured creditors, and the Creditors' Committee to easily compare and contrast the differing terms of any bids that may be received on or prior to the deadline for bids.  The Agreement contains the Debtor's preferred transaction terms and transaction structure but interested bidders may mark-up the Agreement in connection with their bids, subject to review and acceptance of any changes by the Debtor, in consultation with the

secured creditors and the Creditors' Committee.  The Debtor, in consultation with the Committee

and secured creditors, reserves the right to modify the terms of the Agreement.

27.     The Debtor does not currently have a contract with a purchaser that may serve as

a "stalking horse" bidder and, as a result, all potential purchasers will compete on a level playing

field in connection with their efforts to acquire the Debtor's assets.[4]     The Agreement

contemplates a sale of substantially all of the Debtor's assets, as a complete package or as

discrete units, free and clear of liens, claims, encumbrances, and other interests with all such

interests to attach to the proceeds of the sale in the order of priority and with the same validity,

force, and effect that such interest has against the assets.  A detailed description of the Debtor's

assets is available to any potential bidder who has executed a confidentiality agreement. The

Agreement contains the following material terms:

    a.     Purchased Assets – unless defined differently in an Agreement submitted
           by a potential purchaser, all of the Debtor's real estate, any improvements
           located on such real estate, all owned furniture, fixtures, machinery and
           equipment, and all owned inventory collectively referred to as the
           "Purchased Assets");

    b.     Assumed Contracts – each bidder is entitled to select the executory
           contracts and unexpired leases that the bidder desires to acquire;

    c.     Purchase Price – paid in immediately available funds at closing;

    d.     Assumed Liabilities – include "cure" payments under assumed contracts,
           post-closing liabilities under assumed contracts, and post-closing liabilities
           related to or arising from the Purchased Assets;

    e.     Required Cash Deposit – 10% of the Initial Bid (defined below);

    f.     Post-closing Indemnification by Debtor – none; and

---

[4] It is possible that during the bidding process a qualified bidder may request stalking horse designation and
protection notwithstanding the procedures set forth above.  As such, the Debtor reserves the right to file
supplemental pleadings (on shortened notice) and only if necessary and appropriate to accomplish the same within
the time frame set forth in this Motion.

g.  Excluded Assets – include, without limitation, all cash, accounts receivable, and Chapter 5 causes of action.

28.  The Agreement will be "shopped" in the marketplace using the sale process described below so as to ensure that the estate realizes the maximum value for the assets.  The Debtor's proposed process for continuing to market the assets for sale (the "Proposed Sale Process") is intended to ensure that all interested parties can compete on a level playing field in an open and fair process.  Parties must submit bids in accordance with the procedures described herein or as otherwise approved by the Court.  Accordingly, the Debtor requests that this Court approve the Proposed Sale Process, including the following suggested bid procedures (the "Bid Procedures"):

a.  <u>Initial Bid</u>.  Any third party that is interested in acquiring any or all the Purchased Assets must submit an "Initial Bid" in conformance with the Bid Procedures by not later than 5:00 p.m. (EDT) on July 11, 2014 (the "Bid Deadline").  Any such Initial Bid must:

i.  Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the form Agreement) with, at a minimum, the following requirements:  (i) having substantially identical terms and conditions as the Agreement; (ii) containing terms and conditions no less favorable to the Debtor's estate than the terms and conditions in the Agreement (provided that no Initial Bid shall provide for the payment to the bidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (iii) the Agreement should not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency related to the approval of the bidder's board of directors or other internal approvals or consents, (4) material adverse change clause, or (5) any conditions precedent to the bidder's obligation to purchase the assets other than those in the Agreement; (iv) a written statement by the bidder stating that it agrees to be bound by the terms and conditions of the form of Agreement and close on the sale within 10 days of entry of the Court's order approving a sale; (v) designating the executory contracts and unexpired leases as to which the bidder seeks assumption by the Debtor and assignment to the bidder and any other assets of the Debtor that are subject to the bid; (vi) be subject to acceptance by the Debtor solely by its execution of the bid and

approval of the bid by the Court; (vii) be accompanied by the deposit described below; (viii) be received at or prior to the Bid Deadline; and (ix) provide for the payment of an all-cash purchase price;

ii.     Include a cashiers' or certified check payable to the order of TLC Health Network, Debtor in Possession, representing a deposit equal to 10% of the Initial Bid (the "Deposit") (it being understood that Deposits may also be sent by wire transfer of immediately available funds);[5]

iii.    Be accompanied by current audited financial statements of the potential bidder, provided however, if the potential bidder is an entity formed for the purpose of submitting the Initial Bid, (a) current audited financial statements of the equity holder(s) of the potential bidder or such other financial disclosure acceptable to the Debtor, the secured creditors, and the Creditors' Committee, demonstrating such potential bidder's ability to close on the transaction and (b) a written guarantee, letter of credit or other form of credit enhancement acceptable to the Debtor (after detailed consultation with the secured creditors and Creditors' Committee) pursuant to which the equity holder(s) of the potential bidder are responsible for such bidder's obligations in connection with the sale;

iv.     Fully disclose the identity of each entity that will be bidding for the assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

v.      To the extent not previously provided to the Debtor, be accompanied by evidence satisfactory to the Debtor, the secured creditors and the Creditors' Committee in their reasonable discretion that the bidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) and within the timeframe contemplated under the Agreement in the event that it submits the Prevailing Bid at the Auction (as defined below);

vi.     Remain open and irrevocable until thirty days after the entry of an order by the Court approving a definitive agreement providing for the sale of the assets; and

---

[5] If a bidder submits a bid that is selected as the Prevailing Bid (as defined below) and such bidder subsequently defaults or breaches, then the deposit submitted by such bidder shall be deemed forfeited and shall be retained by the Debtor. Deposits of other bidders will be returned to such bidders promptly upon the Court's entry of an order approving the Prevailing Bid (defined below), except for the deposit of the Next Highest Bidder, which shall be returned to the Next Highest Bidder promptly upon the closing of the sale to the Prevailing Bidder.

vii. Be submitted to (i) TLC Health Network, 845 Rt. 5 and 20, Irving, New York 14081-9706, Attn: John Galati, Interim CEO, (ii) counsel to the Debtor, Menter, Rudin & Trivelpiece, P.C., 308 Maltbie Street, Suite 200, Syracuse, NY 13204-1439, Attn: Jeffrey A. Dove, Esq. (Fax No. 315-474-4040), and (iii) counsel to the Creditors' Committee, Bond, Schoeneck & King, PLLC**,** One Lincoln Center, Syracuse, NY 13202-1355, Attn: Stephen A. Donato, Esq., (collectively, the "Objection Parties") in each case so as to be received not later than the Bid Deadline. The Debtor, in consultation with the secured creditors and Creditors' Committee, may extend the Bid Deadline without further notice and for one or more bidders, but shall not be obligated to do so. The Debtor has been, and will continue, providing due diligence information to potential bidders; provided, however, that the Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline or to any person that the Debtor, the secured creditors and Creditors' Committee determine is not reasonably likely to be a Qualified Bidder. The Debtor will provide non-public due diligence information only to those parties who have entered into appropriate confidentiality arrangements with the Debtor.

b. <u>Auction</u>. In the event that the Debtor timely receives two or more conforming Initial Bids from prospective purchasers as described above (each, a "Qualified Bidder"), then the Debtor, in consultation with the secured creditors and Creditors' Committee, will conduct an auction with respect to the sale of the assets on July 15, 2014, beginning at 10.00 a.m., at _____, Buffalo, New York, (the "Auction"). Based upon the terms of the qualified bids received, the level of interest expressed as to particular assets, and such other information as the Debtor determines is relevant, the Debtor may propose rules for the conduct of the Auction in the manner the Debtor determines, in consultation with the secured creditor and the Creditors' Committee, will promote the goals of the Auction and achieve the maximum realizable value for the assets. In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bid Procedures and to submit an Initial Bid that is timely and that complies in all respects with the Bid Procedures Order. At the Auction, Qualified Bidders may submit successive bids in increments of at least **$100,000** greater than the prior bid for the purchase of all of the assets. Qualified Bidders may also submit bids for one or more but less than all of the Debtor's assets. Immediately prior to concluding the Auction, the Debtor, in consultation with the secured creditors and Creditors' Committee, shall determine which bid or bids is the highest or best offer, subject to Bankruptcy Court approval (the "Prevailing Bid") and the next highest or otherwise best offer after the Prevailing Bid (the "Next Highest Bid"). Qualified Bidders shall also be permitted to make other modifications to their bids at the Auction in order to make their bids more favorable to the estate. All

bidding for the assets will be concluded at the Auction and there will be no further bidding at the Sale Hearing. All bids shall be made on an open basis, participating Qualified Bidders shall be entitled to be present for all bidding; and the principals of each participating Qualified Bidder shall be fully disclosed to all other participating Qualified Bidders throughout the entire Auction. All bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Court and waived any right to jury trial in connection with any disputes relating to the Auction, the Sale of the assets and the construction and enforcement of the Prevailing Bid or the Next Highest Bid. Regardless of whether an Initial Bid is received from a Qualified Bidder at or prior to the Bid Deadline, the Auction shall proceed for the limited purpose of allowing the secured creditors to exercise their right to Credit Bid and if the secured creditors decline to exercise such right at the Auction then, the Sale Hearing shall be cancelled; provided, however that if the secured creditors exercise their right to Credit Bid at the Auction then the Sale Hearing shall be held for the purpose of approving the Sale of the Purchased Assets to the secured creditors (or their nominees).

c.    Credit Bid. The secured creditors (including any nominee or designee of the Lenders) will have the right to Credit Bid at the Auction in accordance with § 363(k) of the Bankruptcy Code up to the total amount outstanding under their respective secured loan amounts, provided however, that a secured creditor that submits a credit bid (a "Credit Bidder") shall satisfy with cash (a) any cure obligations associated with the assumption and assignment of any Assumed Contracts, and (b) any obligations that are secured by a lien against the Purchased Assets and Assumed Contracts that is senior to that asserted by the Credit Bidder. For the avoidance of all doubt, the secured creditors shall be deemed "Qualified Bidders" without the necessity of complying with paragraphs (a)(i)-(iii) in the Bidding Procedures.

d.    Highest and/or Best Bid. At all times during the Proposed Sale Process, the Debtor, in consultation with the secured creditors and Creditors' Committee, retain the right to determine which bid constitutes the highest or otherwise best offer for the purchase of the assets, and which bid should be selected as the Prevailing Bid and the Next Highest Bid, if any, all subject to final approval by the Court pursuant to the provisions of Section 363(b) of the Bankruptcy Code. When evaluating the bids, the Debtor, the Lenders and Creditors' Committee shall consider the financial and contractual terms of each bid and factors affecting the speed and certainty of closing each bid. Without limiting the generality of the foregoing, the Debtor may, at any time before entry of an order of the Court approving a Prevailing Bid, reject any bid that, after consultation with the secured creditors and Creditors' Committee, is determined to be (i) inadequate or insufficient, (ii) contrary to the requirements of the Bankruptcy Code or the Proposed Sale Process, or (iii) contrary to the best interests of the

estate or its creditors. Prior to the Sale Hearing, the Debtor reserves the right to file with the Court additional pleadings in support of the sale to the winning bidder, together with a copy of the Prevailing Bid.

e. <u>Sale Hearing</u>. The Sale Hearing will be conducted on July 16, 2014 at 1:00 p.m. at the United States Bankruptcy Court, Western District of New York, Part II, 200 Pearl Street, Buffalo, New York, before the Honorable Carl L. Bucki, Chief United States Bankruptcy Judge, at which time the Debtor intends to present the Prevailing Bid for approval by the Court pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m), 363(n), and 365 of the Bankruptcy Code. The Debtor shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing. Upon the failure to consummate a sale of the assets after the Sale Hearing because of the occurrence of a breach or default under the terms of the Prevailing Bid, such bidder shall be deemed to have forfeited its Deposit in partial satisfaction of the damages incurred by the estate and the Next Highest Bid, as disclosed at the Sale Hearing, shall be deemed the Prevailing Bid without further order of the Court and the parties shall be authorized to consummate the transaction contemplated by such Next Highest Bid. The Sale Hearing may be adjourned by the Debtor in consultation with the Creditors' Committee and the secured creditors, or by the Court at any time.

f. <u>Sale Implementation</u>. Following the approval of the Prevailing Bid at the Sale Hearing, the Debtor will be authorized to take all commercially reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Prevailing Bid, including (but not limited to) seeking entry of a sale order.

g. <u>Conflict.</u> Any conflict between the terms and conditions of the Procedures Order and any purchase agreement executed by the Debtor and any of the bidders shall be resolved in favor of the Procedures Order.

29. The Debtor believes that the Proposed Sale Process offers the best opportunity for the Debtor to maximize the value of its assets for the benefit of its estate given the current circumstances and lending environment available to the Debtor. The Debtor submits that implementation of the Proposed Sale Process is in the best interests of the estate herein, and should be approved.

## PROPOSED NOTICE OF AUCTION AND SALE HEARING

30.    Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide its creditors with 21 days' notice of the Sale Hearing, such notice must include the date, time, and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested in the sale Motion.  The Debtor proposes that the deadline for objecting to approval of the proposed Sale be set for 5:00 p.m., prevailing local time, one (1) day prior to the date set for the Sale Hearing.

31.    Within one (1) day after entry of the Procedures Order, the Debtor will serve a notice (the "Auction and Hearing Notice") by first-class mail, postage prepaid upon the following parties:  (a) the Office of the U.S. Trustee for the Western District of New York; (b) counsel to the secured creditors; (c) counsel to the Creditors' Committee; (d) all other known parties with liens of record on assets of the Debtor as of the Petition Date; (e) any landlords for real property leased by the Debtor; and (g) all parties that have filed notices of appearance requesting service in these cases (the "Notice Parties").  The Auction and Hearing Notice is attached to this Motion as Exhibit "B" and indicates that the Motion can be obtained without charge from counsel for the Debtor.

32.    The Auction and Hearing Notice will include, among other things, the date, time, and place of the Auction and the Sale Hearing and the deadline for filing any objections to the Sale once they are set by the Court, and, will therefore, comply with Bankruptcy Rule 2002(c). The Debtor submits that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the assets.  Therefore, the Debtor respectfully requests that this Court approve the notice procedures proposed above.

**PROPOSED PROCEDURES FOR AND NOTICE OF ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

33.     Additionally, the Debtor, as part of the sale, is prepared to assume and assign

certain executory contracts and unexpired leases to the bidder submitting the Prevailing Bid (the

"Successful Bidder") to the extent that such bidder desires certain contracts or leases as part of

the Prevailing Bid.  As soon as practicable, but no later than July 1, 2014, the Debtor will file a

schedule of cure obligations (the "Cure Schedule") for the contracts and leases that may be

assumed and assigned (the "Assumed and Assigned Agreements").  The Cure Schedule will

include a description of each Assumed and Assigned Agreement potentially to be assumed and

assigned under the Agreement or other agreement with the Successful Bidder and the amount, if

any, the Debtor believes is necessary to cure such agreements pursuant to Section 365 of the

Bankruptcy Code (the "Cure Amounts").  A copy of the Cure Schedule, together with a notice

(the "Assumption and Assignment Notice"), will be served on each of the nondebtor parties

listed on the Cure Schedule by first class mail on the date that the Cure Schedule is filed with the

Court.[6]  Any objections to the assumption and assignment of any executory contract or unexpired

lease identified on the Cure Schedule, including, but not limited to, objections relating to

adequate assurance of future performance or to the Cure Amounts set forth on such schedule,

must be in writing, filed with the Court, and be actually received on or before one (1) business

day before the Auction and Sale Hearing by 5:00 p.m. by the Objection Parties.  Any objection to

the Cure Amounts shall set forth the specific default or defaults in any Assumed and Assigned

Agreements and set forth the specific monetary amount that differs from the amount (if any)

specified by the Debtor in the Cure Schedule.

---

[6] The designation of a contract on the Cure Schedule is without prejudice to the Debtor's rights and shall not
constitute an admission that such contracts are executory contracts the subject of Section 365 protections.

34.     If no objections are received, then the Cure Amounts set forth in the Cure Schedule will be binding upon the nondebtor parties to the Assumed and Assigned Agreements for all purposes in this Chapter 11 case and otherwise, and will constitute a final determination of the total Cure Amounts required to be paid by the Debtor in connection with the assumption and assignment of the Assumed and Assigned Agreements.  In addition, all counterparties to the Assumed and Assigned Agreements will (a) be forever barred from objecting to the Cure Amounts and from asserting any additional cure or other amounts with respect to the Assumed and Assigned Agreements, and the Debtor and the Successful Bidder will be entitled to rely solely upon the Cure Amounts set forth in the Cure Schedule, (b) be deemed to have consented to the assumption and assignment, and (c) be forever barred and estopped from asserting or claiming against the Debtor or the successful bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed and Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assumed and Assigned Agreements.

35.     Where a nondebtor counterparty to an Assumed and Assigned Agreement files an objection asserting a cure amount higher than the proposed Cure Amounts (the "Disputed Cure Amount"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the Successful Bidder's consent to such resolution, the Debtor shall promptly provide the Creditors' Committee, the secured creditors, and other parties in interest notice and an opportunity to object to such proposed resolution or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid under Section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Sale Hearing (or at such other date and time as

may be fixed by this Court). At the election of the Debtor, the executory contract the subject of a Disputed Cure Amount may none the less be assigned to the Successful Bidder at Closing free and clear of the objection so long as the amount relating to the Disputed Cure Amount is escrowed by the Debtor. The Debtor intends to cooperate with counterparties to Assumed and Assigned Agreements to attempt to reconcile any differences in a particular cure amount.

36.    The Debtor requests that any party failing to object to the proposed transactions be deemed to consent to the treatment of its executory contract and/or unexpired lease under Section 365 of the Bankruptcy Code. *See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.),* 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabeel),* 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). Moreover, the Debtor requests that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment. *See* 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

## RELIEF REQUESTED

37.    By this Motion, the Debtor requests that the Court grant the following relief:

a.    Following the Procedures Hearing, enter the Procedures Order in a form attached to this Motion as Exhibit "C" approving the (i) Proposed Sale Process and the Bid Procedures, including the procedures for submitting Initial Bids, conducting the Auction and identifying the Prevailing Bid and the Next Highest Bid, (ii) the Proposed Notice of Auction and Sale Hearing, and (iii) the Proposed Procedures and Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases; and

b.    Following the Sale Hearing, enter an order approving the sale of the assets in accordance with the Proposed Sale Process and making the following determinations, among others, with respect to such sale or sales:

i.      that such sale has been agreed upon, and will be made and completed, in good faith, for purposes of the provisions of Section 363(m) of the Bankruptcy Code;

ii.     that such sale shall be made, and the Purchased Assets shall be delivered to the Successful Bidder, free and clear of any and all liens, claims, encumbrances, and interests (other than as specified in the definitive agreement) with any liens, claims, encumbrances, and interests to attach to the sale proceeds in the same manner and priority as existed on the Petition Date;

iii.    that the party who submitted the Prevailing Bid shall receive good, valid, and marketable title to the Purchased Assets (including the executory contracts and unexpired leases included within each Prevailing Bid that is approved by the Court);

iv.     that the Debtor has the authority at the Closing to assume and assign to the Successful Bidder all executory contracts designated by the Successful Bidder in the Agreement free and clear of liens, claims, and encumbrances, and to find that the Cure Amounts are in full satisfaction of all amounts due and owing to cure the same; and

v.      that the fourteen (14) day stay period provided for in Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure shall not be in effect with respect to the Sale Order and the Sale Order shall be effective and enforceable immediately upon its entry.

## LEGAL ARGUMENTS IN SUPPORT OF REQUESTED RELIEF

### A.    The Proposed Sale of Purchased Assets Is Within the Sound Business Judgment of the Debtor and the Proposed Bid Procedures Are Appropriate and Reasonable.

38.    Section 363 of the Bankruptcy Code provides that debtors in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate...."  11 U.S.C. § 363(b)(1); s*ee also* Bankruptcy Rule 6004(b)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction").

39.    The decision to sell assets outside the ordinary course of business is based upon the sound business judgment of the debtor.  *See, e.g., In re Chateaugay Corp.*, 973 F.2d 141 (2d

Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 772 F.2d 1063, 1071 (2d Cir. 1983); *In re Adelphia Commc'ns Corp.,* No. 02-41729 (REG) (Bankr. S.D.N.Y. July 31, 2002). *See also Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993), quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) ("the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company,'" which has continued applicability in bankruptcy).

40.     Courts generally show great deference to a debtor in possession's decisions when applying the business judgment standard. *See In re Global Crossing, Ltd.,* 295 B.R. 726, 744 n.58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a bankruptcy court to substitute its own business judgment for that of the [d]ebtors and their advisors, so long as they have satisfied the requirements articulated in the caselaw."). Deference is inappropriate only if such business judgment is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *Richmond Metal Finishers,* 756 F.2d at 1047. *In re Integrated Res., Inc.,* 147 B.R. at 656 (there is a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company").

41.     Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *In re Betty Owens Sch.,* 1997 U.S.

Dist. Lexis 5877 (S.D.N.Y. 1997); accord *In re Delaware and Hudson Ry. Co.,* 124 B.R. 169, 166 (D. Del. 1991); *In re Decora Indus., Inc.,* Case No. 00-4459, 2002 WL 32332749 at *3 (Bankr. D. Del. May 20, 2002). The business judgment standard has been met here.

42.     The Debtor is losing money and is unable to sustain operations over any extended period of time. Selling its assets as part of a going concern, not only maximizes value to creditors, but also increases the possibility that critical health care services will continue to be delivered in the areas currently served by the Debtor. Additionally, a sale of the Debtor's assets may allow certain of the Debtor's employees to retain employment. For all of the reasons that follow, the proposed sale of the Debtor's assets and the assumption and assignment of the Debtor's executory contracts in connection with the Bid Procedures satisfies the business judgment standard and the Bid Procedures are abundantly reasonable and appropriate and allow for a reasonable period of time for interested bidders to submit bids for the assets.

43.     First, the timeline for submitting bids under the proposed Bid Procedures is necessary to obtain the maximum value for the Debtor's assets and to preserve the value of the assets under the circumstances. This suggested timeframe provide parties with ample opportunity to object, appear and be heard with respect to all dispositions contemplated by the auction process. *See In re US Airways Group, Inc.*, 287 B.R. 643, 646-49 (Bankr. E.D. Va. 2002) (approving "fast track" authority to renegotiate or reject executory contracts where rights of interested parties are preserved).

44.     Second, subject to this Court's approval, the Debtor will provide notice of the auction to interested parties by serving the Auction and Sale Notice which will clearly identify (i) the deadline fixed for filing objections to any sale of the Debtor's assets and assumption and assignment of the executory contracts, (ii) the date of the Auction, and (iii) the date of the Sale

Hearing. Service of the Auction and Sale Notice upon the Notice Parties identified herein complies with the Bankruptcy Rules.

45. Third, the Bid Procedures contemplate a fully negotiated arm's-length transaction between the Debtor and the potential buyer. A purchaser's good faith may be satisfied where a sale is the product of arm's-length negotiations between parties. *See WBQ Partnership*, 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) (stating that "[a] negotiation conducted at arm's length helps to ensure that the agreed price ultimately will be fair and reasonable"); *In re Apex Oil Co.,* 92 B.R. 847, 870 (Bankr. E.D. Mo. 1988). Alternatively, lack of good faith is typically determined by actions that involve fraudulent conduct, collusion or an attempt to take unfair advantage of other bidders during the sale proceedings. *See Willemain v. Kivitz (In re Willemain),* 764 F.2d 1019, 1023 (4th Cir. 1985).

46. Fourth, the Bid Procedures will ensure that that any price obtained for the assets will be fair and reasonable. The competitive bidding process should enable the Debtor to capture value from the assets for the benefit of the Debtor's estates and creditors by taking full advantage of the potential buyer pool. The financial information required of eligible bidders will also permit the Debtor, the secured creditor, and the Creditors' Committee to analyze each bid with respect to the potential purchaser's ability to satisfy the financial obligations assumed thereby. Moreover, the open auction will also provide transparency to the bidding process and make reasonably certain that any successful bid is the highest or otherwise best bid for such asset, all under the direction of the Debtor and supervision of the secured creditor and the Creditors' Committee.

47. Finally, the marketing efforts the Debtor intends to undertake prior to the auction, together with the efforts already undertaken by Debtor's broker, will ensure that any successful

bids represent a fair value for the assets in question. *See In re W.A. Mallory Co.*, 214 B.R. 834, 837-38 (Bankr. E.D. Va. 1997). The flexibility provided by the Bid Procedures is consistent with the discretion typically afforded procedures governing the disposition of assets under Section 363(b). *See Id.* at 838 (stating that "[e]stablishing an arbitrary percentage which a proposed purchase price needs to meet before a sale is consummated does not serve the purposes of the Bankruptcy Code..."). If a party raises legitimate concerns about the extent to which the Bid Procedures will ensure fair value for the Debtor's assets, the Debtor intends to present evidence at the Sale Hearing confirming that such a price is reasonable under the circumstances.

48.     In sum, the sale of the Debtor's assets and the Bid Procedures contemplated herein reflect a sound business purpose, are a valid exercise of the Debtor's business judgment, and are abundantly fair and reasonable.

## B.     The Auction Will Satisfy the Requirements of Section 363(f) For a Sale Free and Clear.

49.     In the interest of attracting the best offers, the sale of the Debtor's assets should be free and clear of any and all liens, claims, encumbrances, and interests in accordance with § 363(f) of the Bankruptcy Code, with such liens, claims, encumbrances, and interests attaching to the proceeds of the sale in accordance with the relative priorities of such liens, claims, encumbrances and interests. Under § 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate free and clear of all interests (including liens, claims and encumbrances) if

> (a)     applicable nonbankruptcy law permits the sale of such property free and clear of such interest,
>
> (b)     the entity with the interest consents,
>
> (c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property,

(d)  such interest is in bona fide dispute, or

(e)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest.

*See* 11 U.S.C. § 363(f); *see also Precision Indus. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 545 (7th Cir. 2003). Section 363(f) is drafted in the disjunctive. Satisfaction of any one of the factors set forth in Section 363(f) allows a sale, including the dispositions contemplated herein, and transfer assets of the estate free and clear.

50.  With respect to any party asserting a lien, claim, or encumbrance against the Assets, the Debtor believes that they will be able to satisfy one or more of the conditions set forth in § 363(f). In particular, the Debtor believes that any lienholder will be adequately protected by having their interest, if any, attached to all proceeds ultimately attributable to the assets in which such creditor alleges an interest, in the same order of priority and with the same validity, force and effect that such creditor had prior to the sale, subject to any claims and defenses the Debtor and its estate may have with respect thereto.

51.  Finally, the Debtor believes that creditors with any interest in the assets and/or executory contracts, including the secured creditors, will consent to a proposed sale free and clear of liens, claims, encumbrances and interests, if applicable. *See* 11 U.S.C. §363(f)(2).[7] Indeed, the secured creditors and Creditors' Committee have been consulted by the Debtor in the preparation of this Motion and will oversee Debtor's efforts in conducting the sale. To the extent such creditors do not consent explicitly or implicitly, the Debtor believes that the sale will satisfy one or more of the factors in Section 363(f).

---

[7]  The Debtor anticipates that at least one of the secured creditors may credit bid for some of the Debtor's assets in the event no bidders submit bids that are satisfactory to the secured creditors.

**C.** **The Successful Bidder at the Auction Will Be Entitled to the
Protections Afforded to Good Faith Purchasers.**

52.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest

in property purchased from the debtor notwithstanding that the sale conducted under § 363(b) is

later reversed or modified on appeal. Specifically, § 363(m) states that:

> The reversal or modification on appeal of an authorization under [section
> 363(b)]...does not affect the validity of a sale...to an entity that
> purchased...such property in good faith, whether or not such entity knew
> of the pendency of the appeal, unless such authorization and such
> sale...were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only affording finality to the

judgment of the bankruptcy court, but particularly to give finality to those orders and judgments

upon which third parties rely.'" *In re Chateaugay Corp.*, 1993 U.S. Dist. Lexis 6130, at *9

(S.D.N.Y. 1993) (quoting *In re Abbotts Dairies of Penn, Inc.*, 788 F.2d 143 and 147); *see also*

*Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)...provides that

good faith transfers of property will not be affected by the reversal or modification on appeal of

an unstayed order, whether or not the transferee knew the pendency of the appeal."); *In re Stein*

*& Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m). good

faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending

appeal").

53.     The selection of the successful bidder will be the product of arm's-length, good-

faith negotiations in an anticipated competitive purchasing process through which the Debtor

will seek to maximize the value available for its assets. The Debtor intends to request at the Sale

Hearing a finding that the successful bidder is a good-faith purchaser entitled to the protections

of § 363(m) of the Bankruptcy Code. The Debtor believes that providing the successful bidder

with such protection will ensure that the maximum price will be received by the Debtor for the assets and allow for a prompt closing of the sale.

**D.** **Assumption and Assignment of the Debtor's Executory Contracts and Unexpired Leases in Accordance with the Proposed Assumption Procedures Is Appropriate and in the Best Interests of the Estate.**

54.     A debtor in possession may assume an executory contract where assumption is a reasonable exercise of its business judgment. *See* 11 U.S.C. § 365(a); *see e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984); *Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484 (Bankr. S.D. Ohio 1982); *see also In re Extraction Techs.,* 296 B.R. 393, 399 (Bankr. E.D. Va. 2001); *In re Richmond Metal Finishers,* 756 F.2d 1043, 1046-47 (4th Cir. 1985). This requirement is satisfied where a debtor in possession determines in good faith that assumption of an executory contract will benefit the estate. See *In re Gucci*, 193 B.R. 411, 414-15 (S.D.N.Y. 1996); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

55.     Further, a debtor in possession may assume and assign an executory contract only where the trustee has cured all existing defaults under that executory contract. *See* 11 U.S.C. § 365(b)(1), (f)(2); *see In re Shangra-La. Inc.*, 167 F.3d 843, 849 (4th Cir. 1999). In addition, a debtor in possession must provide adequate assurance of future performance under the assumed executory contract if the debtor has defaulted. *See* 11 U.S.C. § 365(b)(1), (f)(2); *see e.g., In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that tenant will thrive and pay rent); *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 172 (Bankr. E.D. Va. 1993). The requirements of "adequate assurance" depend on the facts and circumstances of each case. See*, e.g., In re Martin Paint Stores,* 199 B.R. 258, 263 (Bankr. S.D.N.Y. 1996).

56.     In the event the Prevailing Bid includes a proposed assumption and assignment of an executory contract or unexpired lease, the Debtor will introduce evidence at the Sale Hearing demonstrating that the successful bidder can satisfy the requirements of adequate assurance as contemplated by § 365 of the Bankruptcy Code.  The sale price obtained in connection with a party's bid will be sufficient to cure any defaults applicable to assumed executory contracts.  The Bid Procedures require each potential assignee to provide assurances to satisfy the standards set forth in the Bankruptcy Code.  *See Ames,* 287 B.R. at 115-16.  Indeed, in order to qualify as a Qualified Bidder, each bidder must provide financial information regarding the bidder's ability to fulfill its financial obligations.  *See In re Bygraph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it a strong likelihood of succeeding.)  *See In re CilycoGenesys, Inc.,* 352 B.R. 568, 578 (Bankr. D. Mass. 2006) (stating that "it is appropriate to evaluate the financial condition of the assignee and the likelihood that the nondebtors will receive the benefit of its bargain from the assignee.").  Upon conclusion of the Auction and selection of the successful bidder, the Debtor will file a notice identifying the successful bidder and serve such notice together with evidence of "adequate assurance" upon all counterparties to executory contracts.

57.     The Debtor respectfully submit that the Assumption and Assignment Notice and Cure Schedule described above are appropriate and reasonably tailored to provide all counterparties to executory contracts with adequate notice of the proposed assumption and assignment of the applicable contract.  Ample time is provided for contract parties to object to the Assumption and Assignment Notice and Cure Schedule.  It is anticipated that any objections that may be filed will be heard at the Sale Hearing.

58.     Accordingly, the Debtor submits that implementation of the proposed procedures for addressing assumption and assignment of executory contracts and unexpired leases procedures is appropriate in this case.  As a result, the Court therefore should have a sufficient basis to authorize the Debtor to assume and assign executory contracts and unexpired leases which may form a part of the Prevailing Bid.

### E.     The Court Should Waive the Fourteen Day Stay Imposed by Bankruptcy Rules 6004(h) and 6006(b)

59.     The Debtor requests that, upon entry of the Sale Order, the Court waive the fourteen-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d).  The waiver of the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) is a condition of the Agreement to be entered into with the successful bidder.  The Debtor respectfully requests that the Court waive the fourteen-day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d).

### NOTICE

60.     No trustee or examiner has been appointed in this Chapter 11 case  Notice of this Motion has been provided to:  (a) the Office of the U.S. Trustee for the Western District of New York; (b) counsel to the secured creditors; (c) counsel to the Creditors' Committee; (d) all other known parties with liens of record on assets of the Debtor as of the Petition Date; (e) all parties that have filed notices of appearance requesting service in these cases; and (f) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001, or 9014 or requesting to receive notice prior to the date hereof.  The Debtor submits that no other or further notice need be provided.

## NO PRIOR REQUEST

61.     No prior request for the relief sought in this Motion has been made to this or any other court in connection with this chapter 11 case.

WHEREFORE, the Debtor respectfully requests that the Court (I) enter an order (a) establishing the bid and sale procedures described herein, (b) approving the form and notice of the sale, and (c) approving the procedures and contemplated notice of assumption and assignment of executory contracts and unexpired leases, and (II) enter an order approving the sale to a successful bidder, and grant such other and further relief to the Debtor as the Court may deem proper.

Dated:   Syracuse, New York             Respectfully submitted,
      May 22, 2014                    **MENTER, RUDIN & TRIVELPIECE, P.C**
                                             *Attorneys for the Debtor and Debtor In Possession*

                                             By:     */s/Jeffrey A. Dove*
                                             Jeffrey A. Dove, Esq.
                                             308 Maltbie Street, Suite 200
                                             Syracuse, New York 13204-1439
                                             Telephone:  (315) 474-7541
                                             Facsimile:   (315) 474-4040