UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re:

TLC HEALTH NETWORK,

Debtor.

Case No. 1-13-13294-CLB

Chapter 11

**MOTION OF TLC HEALTH NETWORK TO ESTABLISH
TERMS AND CONDITIONS UNDER § 105(a) AND §§ 363(b),
AND (c), FOR THE ACCEPTANCE OF GRANT FUNDING BY
THE NEW YORK STATE DEPARTMENT OF HEALTH**

TLC Health Network, as debtor and debtor in possession (the "Debtor"), pursuant to Bankruptcy Code Sections 105(a) and 363(b) and (c) moves this Court for entry of an order approving the terms and conditions (the "T&C Order") under which the Debtor may receive certain grant funding under programs administered by the New York Department of Health (the "DOH") (the "Motion"). In support of its Motion, the Debtor respectfully represents as follows:

**SUMMARY OF RELIEF REQUESTED**

The Debtor is in the process of analyzing its service lines in an effort to develop a restructuring plan. Simultaneously, it has engaged in a program to market substantially all of its assets for sale in order to fully develop all of the options available to the Debtor and its creditors. The Court has previously entered an order approving the procedures pursuant to which the Debtor may offer its assets for sale. By this Motion, the Debtor seeks approval for the terms and conditions likely to be imposed if it is awarded grant funding by the DOH under the Interim Access Assurance Fund ("IAAF") program.

## BACKGROUND AND JURISDICTION

1. On December 16, 2014 (the "Petition Date"), Debtor commenced its reorganization case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2. The Debtor continues to operate its businesses and manage its properties as a debtor in possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3. On January 6, 2014, an Official Committee of Unsecured Creditors was appointed in the Debtor's case (the "Creditors' Committee").

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are § 105(a) and §§ 363(c) and (c) of the Bankruptcy Code.

**The Business**

5. The Debtor's predecessor, Lake Shore Hospital, Inc., established the Hospital as a not-for-profit community hospital in 1965, its mission focused on delivering a broad range of emergency, acute care and long term care services to residents of Northern Chautauqua, Southern Erie, and Western Cattaraugus Counties. Lake Shore set quality and service as a key differentiator with the values of compassion, professionalism, and integrity at the forefront, in keeping with the mantra "Quality Healthcare Where Caring Comes First." As of the Petition Date, the Hospital hosted a wide range of services including: Acute Care, Behavioral Health, Cardiac Rehabilitation, Cardiopulmonary, Diagnostic Imaging, Emergency Care, Gastroenterology, Home Health Care, Laboratory Services, Long Term Care, Physical Therapy, Short Term Rehabilitation, Surgical Care, and Women's Imaging.

6. The Hospital's primary and secondary service areas include a largely rural population in Northern Chautauqua, Southern Erie, and Western Cattaraugus Counties. Seventy-five percent of the hospital's patient population derives from the following zip codes: Angola (14006), Gowanda (14070), Silver Creek (14136), Irving (14081), Forestville (14062), Derby (14047), Dunkirk (14048), North Collins (14111), South Dayton (14138), Cattaraugus (14719), Perrysburg (14129), Collins (14034), and Fredonia (14063).

7. Besides the general population, the Hospital serves many vulnerable and underserved populations including the Seneca Nation of Indians (Cattaraugus and Allegheny Reservations), a large old-order Amish population, and a host of seasonal migrant workers. In addition, the shores of Lake Erie provide an influx of seasonal beachfront residents that often turn to the Hospital for their healthcare needs.

8. To further service its local population's healthcare needs, along with the Hospital, the Debtor also maintains other health care facilities throughout the Tri-County Region of Western New York, including, among others, an Urgent Care and Primary Care Facilities in Gowanda, New York, and Forestville, New York, and a Chemical Dependency Clinic in Cassadaga, New York.

9. Due to financial pressures created by declining populations and patient volumes, declining reimbursement rates, and increased mandates, Lake Shore endeavored to complete a series of mergers with other local hospitals. Lake Shore believed that by combining resources with other hospitals it could save money through consolidation of administrative costs, streamlining operations and increased barraging power with vendors due to a larger economic scale.

10. Accordingly, in 2002, the Lake Shore merged with Tri-County Memorial Hospital ("Tri-County") in Gowanda to form the Debtor, as it was constituted as of the Petition Date (the "Tri-County Merger"). Although the Tri-County Merger resulted in some cost-savings, both the Hospital and Tri-County continued to struggle financially.

11. Following the Berger Commission Report 2008, the board of the Debtor and the board of neighboring Brooks Memorial Hospital ("Brooks") agreed to a merger (the "LERHSNY Merger"). Under the terms of the LERHSNY Merger, the Debtor and Brooks agreed to form a parent corporation named Lake Erie Regional Health System of New York ("LERHSNY"), to hold and operate both the Debtor and Brooks. The Debtor and Brooks remained separate not-for-profit corporations.

12. The Debtor continued to struggle after the LERHSNY Merger. Despite efforts to downsize operations and effect service and system efficiencies, the Debtor's accumulated and emergent financial burdens reached critical proportions.

13. In 2009, a major flood destroyed Tri-County Memorial Hospital, forced its closure and left the Hospital as the Debtor's only operating hospital facility. The Debtor's attempts to rebuild Tri-County also failed and lead to a further deterioration in the Debtor's financial position. The Debtor's financial struggles after its failed attempt to rebuild Tri-County continued to be exacerbated by declining populations and patient volumes, declining reimbursement rates, and increased mandates.

14. In the five years after the LERHSNY Merger, the Debtor's losses from operations total over $24 million. The Debtor lost approximately $6.5 million in 2008, $1.6 million in 2009, $1.2 million in 2011, $4 million in 2012, and approximately, $7.4 million from January 1, 2013 through September 30, 2013.

15. On October 15, 2013, the LERHSNY board of directors made the decision (the "Closure Decision") to cease all operations at the Hospital, with the exception of its emergency services on January 31, 2014 (the "Closure Date").

16. In the weeks after the Closure Decision, however, it became apparent that the Hospital would not have the cash to operate through the Closure Date. Accordingly, the LERSHNY board resolved that the Debtor would immediately file for relief under Chapter 11 of the Bankruptcy Code.

**Capital Structure, Secured Loan Facility and Potential Grant Funding**

17. The Debtor is a New York not-for-profit corporation whose "active parent" is LERHSNY.

18. As of the Petition Date, the Debtor's obligations for secured debt included:

| | |
|---|---|
| Community Bank, NA | $34,000 |
| Dormitory Authority of State of New York[1] | $240,000 |
| UPMC | $1,250,000 |
| Brooks | $340,000 |

19. Since the Petition Date, the Community Bank loan has been paid in full, the UPMC debt has been reduced to approximately $700,000, and DASNY has been paid down to approximately $180,000. Also since the Petition Date, the Court has authorized the Debtor to borrow additional operating capital, as follows:

| | |
|---|---|
| Brooks[2] | $650,000 |
| DASNY[3] | $1,000,000 |

---

[1] Hereinafter referred to as "DASNY".
[2] The Debtor has borrowed the $660,000. In addition to the funding for operations, the Court also approved a $1.65 million loan from Brooks to permit the Debtor to pay certain construction costs associated with the Gowanda Urgent Care facility. The construction loan was fully funded and has since been repaid by the proceeds of a HEAL grant.
[3] Although authorized, the Debtor has yet to draw on the DASNY facility and certain deadlines in the facility have expired. DASNY is considering issuing a fresh commitment, but to date none has been received.

20. Accordingly, the Debtor's assets currently secure financing in the amount of approximately $1.88 million.

21. While the Debtor is modifying its operations and performing a financial analysis of each service line, the Debtor continues to lose money on operations, and does not have the capital resources to operate past July absent additional funding.

22. While the Debtor has embarked on a process to determine the market for a sale of some or all of its assets with a number of entities, the Debtor has also applied to the DOH for funding under the IAAF program. Specifically, the Debtor has applied for IAAF grant funding in the amount of approximately $7.3 million. If approved, the Debtor understands that the funding would be made available on an as-needed basis through March 2015. Funding under the program would permit the Debtor to engage in a more deliberate analysis of its service lines and would ensure that the most advantageous options available to the Debtor, the community, the creditors and other parties in interest are fully explored.

23. The Debtor is advised that, if an IAAF grant is awarded, it will be required to ensure that protections are in place so that the funds are used only to bridge operational shortfalls, and are specifically not used to make capital acquisitions or to repay existing debt obligations. In addition, in order to ensure that the Debtor qualifies under the IAAF program, it may be required to extricate itself from the LERHSNY corporate structure such that its financial resources and challenges are not attributed to LERHSNY or Brooks, and vice versa.

### RELIEF REQUESTED

24. By this Motion, the Debtor requests that the Court enter an order restricting the use of any funds received under the IAAF program to operational expenses, and providing that

they are not permitted to be used for repayment of existing secured or unsecured debt obligations.

25. Additionally, the Debtor requests an order of the Court authorizing the Debtor to file an application with the DOH seeking to disassociate from LERHSNY.

**LEGAL ARGUMENTS IN SUPPORT OF REQUESTED RELIEF**

**A. Accepting Grant Funding, With the Described Restrictions, Is Within the Sound Business Judgment of the Debtor and the Proposed Restrictions Are Appropriate and Reasonable.**

26. Section 363 of the Bankruptcy Code provides that debtors in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate...." 11 U.S.C. § 363(b)(1); s*ee also* Bankruptcy Rule 6004(b)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction").

27. The decision to sell assets outside the ordinary course of business is based upon the sound business judgment of the debtor. *See, e.g., In re Chateaugay Corp.,* 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 772 F.2d 1063, 1071 (2d Cir. 1983); *In re Adelphia Commc'ns Corp.,* No. 02-41729 (REG) (Bankr. S.D.N.Y. July 31, 2002). *See also, Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993), quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) ("the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company,'" which has continued applicability in bankruptcy).

28. Courts generally show great deference to a debtor in possession's decisions when applying the business judgment standard. *See In re Global Crossing, Ltd.,* 295 B.R. 726, 744

{33000/28189/JAD/00850980.DOC}    -7-
Case 1-13-13294-CLB    Doc 442    Filed 06/13/14    Entered 06/13/14 13:37:44    Desc
Main Document    Page 7 of 9

n.58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a bankruptcy court to substitute its own business judgment for that of the [d]ebtors and their advisors, so long as they have satisfied the requirements articulated in the caselaw."). Deference is inappropriate only if such business judgment is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *Richmond Metal Finishers,* 756 F.2d at 1047. *In re Integrated Res., Inc.,* 147 B.R. at 656 (there is a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company").

29. The Debtor submits that the business judgment test has been satisfied. The Debtor is losing money and requires additional capital to sustain operations over any extended period of time. The only possible alternative to the grant funding is borrowing additional funds, thereby adding additional debt in front of existing unsecured creditors. The Debtor believes that the grant funding maximizes its ability to analyze its business options while minimizing the cost of the operating capital.

## NOTICE

30. No trustee or examiner has been appointed in this Chapter 11 case Notice of this Motion has been provided to: (a) the Office of the U.S. Trustee for the Western District of New York; (b) counsel to the secured creditors; (c) counsel to the Creditors' Committee; (d) all other known parties with liens of record on assets of the Debtor as of the Petition Date; (e) all parties that have filed notices of appearance requesting service in these cases; and (f) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001, or 9014 or requesting to

receive notice prior to the date hereof. The Debtor submits that no other or further notice need be provided.

## NO PRIOR REQUEST

31. No prior request for the relief sought in this Motion has been made to this or any other court in connection with this Chapter 11 case.

WHEREFORE, the Debtor respectfully requests that the Court enter an order authorizing it to accept any IAAF grant funding that may be awarded, upon the conditions described above, and granting such other and further relief to the Debtor as the Court may deem proper.

Dated: Syracuse, New York
       June 13, 2014

Respectfully submitted,
**MENTER, RUDIN & TRIVELPIECE, P.C**
*Attorneys for the Debtor and Debtor In Possession*

By:    */s/Jeffrey A. Dove*
Jeffrey A. Dove, Esq.
308 Maltbie Street, Suite 200
Syracuse, New York 13204-1439
Telephone: (315) 474-7541
Facsimile: (315) 474-4040